**Walid A. HINDO, Plaintiff–Appellant,**

v.

**UNIVERSITY OF HEALTH SCIENCES/THE CHICAGO MEDICAL SCHOOL, Defendant–Appellee.**

No. 95–1079.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1995.

Decided Sept. 6, 1995.

---

4. The case was later transferred to Judge Tinder, who handled the sentencing in question here.

Robert B. Ramirez, Jr. (argued), Glenview, IL, for plaintiff-appellant.

Eric A. Oesterle (argued), Donna L. Marks, Sonnenschein, Nath & Rosenthal, Chicago, IL, Michael R. Booden, Chicago Medical School–University of Health Sciences, North Chicago, IL, for defendant-appellee.

Before BAUER, MANION, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

Walid Hindo, a current radiologist and former Chairman of the Department of Radiology for the University of Health Sciences/The Chicago Medical School ("University"), brought this action against the University under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.* Hindo claimed that the University defrauded the government when it sought from the North Chicago Veterans Administration Medical Center reimbursement for the salaries and benefits paid by the University to radiology residents who worked at the Medical Center during the 1989–90 academic year, but for whom funding had not been approved by the Veterans Administration. As required under the Act, 31 U.S.C. § 3730(b)(2), Hindo filed his complaint *in camera* under seal and served a copy of it upon the United States government, which had sixty days to "elect to intervene and proceed" with the action. *Id.* The government ultimately notified the district court pursuant to 31 U.S.C. § 3730b(4)(B) that it declined to take over the action. That gave Hindo the right to "conduct the action." 31 U.S.C. §§ 3730b(4)(B), (c)(3). Hindo's complaint was then unsealed and served upon the University in November 1992.

Sometime thereafter, Hindo filed an amended complaint which added a new count alleging that the University violated 31 U.S.C. § 3730(h) by threatening to terminate his tenure and by discharging him from his position as chair of the Department of Radiology for reporting the University's supposed fraudulent billing to the Medical Center. The University moved to dismiss that count on the ground that Hindo's unsuccessful prior state court litigation against the University for retaliatory discharge barred those claims. *See Hindo v. University of Health Sciences/The Chicago Medical Sch.,* 237 Ill.App.3d 453, 178 Ill.Dec. 207, 604 N.E.2d 463 (1992), *appeal denied,* 149 Ill.2d 649, 183 Ill.Dec. 861, 612 N.E.2d 513 (1993). In late 1993, after the discovery cutoff date and while the University's motion to dismiss was pending, Hindo sought leave to file his Second Amended Complaint which added additional allegations of harassment by the University in "retaliation" for Hindo's reporting the fraudulent billing. The district judge denied Hindo's motion to file his Second Amended Complaint and subsequently granted the University's motion to dismiss Hindo's § 3730(h) claim "due to the preclusive effect of the judgment on Hindo's state retaliatory discharge claim."

The bench trial on Hindo's original claim began in late 1994. The district judge asked the parties to focus on the issue of whether the University's invoices were false, and of what the University and the Medical Center knew about the status of Veterans Administration funding for the radiology residents when the Medical Center paid the University's bills for reimbursement of the radiology residents' salaries and benefits. After Hindo had presented his evidence, the University moved for a directed verdict under Federal Rule of Civil Procedure 52(c) on the ground that Hindo's evidence confirmed that the University had not made any false claims. The district court granted the University's motion and entered judgment for the University. Hindo timely appealed. As with most False Claims Act cases, this case is heavily dependent on its facts, which we will now undertake to recite in unfortunate detail.

Hindo is a tenured member of the University's faculty. Until early 1990, he was also the Chairman of the University's Department of Radiology and on the staff at the Medical Center.

The University operates a medical school in North Chicago, Illinois, adjacent to the Medical Center, with which it is affiliated. The University operates privately, while the Medical Center is funded by the Veterans Administration. The University maintains advisory responsibility for the education and training programs conducted with the Medical Center, which retains full responsibility for the care of patients, including all administrative and professional functions relating to that care. The University also oversees a Deans Committee composed of senior University faculty members which serves as a liaison between the University and the Medical Center. Additionally, the University is responsible for nominating all physicians for residency programs, in terms of numbers

and qualifications agreed upon by the Deans Committee and the Veterans Administration.

The two parties operated under a Disbursement Agreement during the relevant time period. Under this agreement, the University paid salaries and benefits directly to the residents, and the Medical Center reimbursed the University the residents' costs in two steps. First, the University submitted to the Medical Center a summary schedule of duty assignments for residents before the start of each calendar quarter. Once the schedule was approved by its Chief of Staff, the Medical Center would pay in advance eighty per cent of the estimated charges for the quarter.

The final payments were made after the end of the calendar quarter. To obtain final payment, the University sent the Medical Center an invoice naming each of the residents that performed services during that quarter, the program level (number of years of training) of each resident, the number of days each resident spent at the hospital (duty days), the appropriate daily charge for each resident, and the total charge for each resident. The number of duty days for each resident was determined by reviewing the Medical Center's time records for each resident.

Before making the final quarterly payment, the Medical Center had an elaborate four-step procedure to review the University's invoices and verify their accuracy. We need not describe this system in detail, but will summarize it. The first three steps called on different levels of Medical Center personnel to certify that the services had been performed as invoiced, sign forms to that effect, and authorize payment of the invoices. The final step required a Medical Center accountant to verify from a certain Veterans Administration form that the Veterans Administration had funded each and every residency position. After the successful completion of all four steps, the Medical Center's Department of Fiscal Services would execute payment of the invoice to the University.

With that background, we now move to the circumstances of Hindo's claim. The Medical Center had applied for and been granted funding for two radiology residencies for the 1988–89 academic year. This funding, however, was temporary, and the Medical Center was required to reapply for the 1989–90 year, which it did in mid-1988. On October 12, 1988, the Veterans Administration notified the Medical Center that it had denied permanent funding for the two radiology residencies. The Veterans Administration permitted the Medical Center one week to appeal its decision. The Medical Center missed the deadline for appeal by two days; the Veterans Administration considered this delay fatal to the Medical Center's appeal. The Veterans Administration, however, placed the Medical Center's request on a "waiting list for temporary resident positions" and promised such funding if resources became available. As we shall see, this last missive caused the Medical Center personnel a certain degree of optimism for the 1989–90 academic year which they were loathe to relinquish short of a definite and final denial of their plea for funding.

As is typical, the University relied on the National Resident Matching Program to staff its resident program from medical schools across the country. The match program imposed a deadline of January 1989 for offering residency positions at the University. Early that month, Dr. Mitchell Rhodes, the University's Associate Dean for Graduate Medical Education Clinical Facilities, contacted Dr. Victor Wahby of the Veterans Administration Central Office regarding the status of funding for the radiology residencies. Dr. Wahby told Dr. Rhodes that although there was no guarantee, it was likely that funding would be approved. Based on this information, the University included the two radiology residencies in its submissions to the National Matching Program.

In addition to this, there were other expressions of optimism for funding. The minutes of meetings of the Medical Center House Staff Review Committee and Medical Center Deans Committee noted that funding had not yet been approved, but that due to the importance of the radiology residencies, some alternative methods for supporting the positions must be explored. In addition, on May 12, 1989, the Veterans Administration

Central Office sent a letter to the Medical Center stating that "it is possible that we may glean a small number of medical resident positions which we may be able to allocate on a temporary basis for the upcoming year." In response to the letter, Eugene Lenarz, who had been assigned the task of ensuring funding for these positions by the House Staff Committee, sent a letter urging the allocation of funding and emphasizing the priority of the Medical Center's request.

Through the month of June and even into July of 1989 (past the July 1 start date of the academic year), members of the Medical Center hierarchy continued to pursue funding for the radiology residencies. Past experience indicated that funding had come through at a late date before and that the Medical Center was high on the priority list for additional funds. Based on those efforts and because two slots had already been committed to the match program, two radiology residents started at the Medical Center on July 2, 1989. These residents worked full-time at the Medical Center throughout that academic year. Funding for the residencies, either from the Veterans Administration or other avenues, never materialized. Notwithstanding this lack of funding, the Medical Center never objected to the presence of the radiology residents.

The University submitted its first estimated bills to the Medical Center in January 1990 for the last two quarters of calendar year 1989. Due to a delay in obtaining time cards from the Medical Center, the University did not submit its final invoices for the first three quarters of the academic year until April 1990. The University's invoices included the costs of the radiology residents. They also included the information required by the Disbursement Agreement, but made no representation as to whether funding had been obtained from the Veterans Administration for radiology or any other residencies. As one might expect, since the Veterans Administration had not approved funding for the radiology residencies, no Veterans Administration form authorizing such funding existed. Notwithstanding the lack of this form and in contravention of their policy and practice for approving invoices from the Uni-

versity, the Medical Center approved the University invoices for reimbursement of the radiology residents' expenses and paid the invoices. The Medical Center paid in excess of $45,000 to the University for these residents.

In July 1990, the Medical Center discovered that it had not received funding for radiology residencies and had improperly paid the University for those services. After exploring whether it could receive after-the-fact funding and realizing it could not, the Medical Center demanded a refund from the University by way of a July 9, 1990, letter from the Medical Center's Chief of Fiscal Services. The Medical Center suggested either a direct refund or an offset of future payments; the University opted for the latter arrangement. Accordingly, the Medical Center subtracted approximately $45,000 from its November 1990 payment. That ended the matter between the Medical Center and the University. And, as we stated earlier, the United States government elected not to pursue the matter further.

As an initial matter, the University restates on appeal its argument that the district court lacked jurisdiction to hear this matter. It cites 31 U.S.C. § 3730(e)(4)(A), which states:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing audit, or investigation, or from the news media unless the person bringing the action is an original source of the information.

The University claims that the letter from the Medical Center to the University constitutes a public disclosure under this section and that Hindo is not an original source of the alleged false claim. This argument is unavailing.

■ An aim of the Act is to encourage "private individuals who are aware of fraud being perpetrated against the Government to bring such information forward," H.R.Rep. No. 660, 99th Cong., 2d Sess. 22 (1986); in accordance with this goal, this section per-

mits only that insider/"whistleblower" to maintain the *qui tam* action. It is to be read conjunctively and the jurisdictional bar is to be raised only when each and every component of this section is present. *See United States ex rel. Lindenthal v. General Dynamics Corp.,* 61 F.3d 1402, 1409 n. 8 (9th Cir. 1995). The University's argument fails because if nothing else, this suit is not based on a public disclosure of the alleged fraud.

■ The only communication of this alleged false claim was by letter between the two parties themselves. Such a communication between two private parties is not a public disclosure under this section. *See United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 652–53 (D.C.Cir.1994); *Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir.1992). The district court therefore properly exercised its jurisdiction over this case.

■ Turning to the substantive issue in this case, the False Claims Act imposes liability on one who "knowingly presents" to the United States government "a false or fraudulent claim for payment." 31 U.S.C. § 3729(a). For purposes of this section, "knowingly" means the person (or entity):

(1) had actual knowledge of the falsity of the information at issue;

(2) acted in deliberate ignorance of the truth or falsity of that information; or

(3) acted in reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b). Innocent mistakes or negligence are not actionable under this section. *See United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1420 (9th Cir.1991). "[W]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false. The requisite intent is the knowing presentation of what is known to be false." *Id.* at 1420. In short, the claim must be a lie. *Wang,* 975 F.2d at 1420.

Hindo contends that the invoice itself for the radiology residents constitutes a false claim because the University knew that the Medical Center had not obtained funding for the residencies. He argues that the falsity

was an implied representation by the University in each invoice that the Medical Center had indeed obtained funding. His argument fails because it distorts the record produced at trial and misapprehends the law.

■ First, there is nothing false in the University's invoices. Those radiology residents performed the work listed in the invoices, and there has been no contention otherwise. An example of a false statement in an invoice in a similar context is the representation that a resident worked five days a week at a hospital for a given quarter when he worked only three; clearly, such is not the case here. With no false statement, we must look then for some purposeful scheme by the University to defraud the Medical Center and ultimately the government. But even reading the scienter requirement in its broadest expanse, Hindo cannot make out a claim. He obstinately maintains that at all times, the University had actual knowledge that the Veterans Administration did not fund the radiology residencies. Indeed, to hear Hindo tell the story, the University knew from the outset that the Veterans Administration never would fund those positions and thereby conducted a sinister fraud upon the government from the moment it submitted the two positions to the match program until it billed the Medical Center for the residents' costs. The record, however, tells a different story, and it is the story to which we are bound.

Both the Medical Center and the University had a vested interest in securing funding for two radiology residencies. The Medical Center wanted them to improve the level of care it offered to its patients; the University wanted them to build prestige in its residency program. Obviously, the Medical Center's desire was more tangible and direct, and it fought very hard to obtain funding for the residencies. It not only sought funding from the Veterans Administration, but also explored alternative sources. Throughout the process, the Veterans Administration expressed optimism to both the Medical Center and the University that funding might become available. No legitimate reading of the record can support an inference that any

party involved here knew that the possibility of funding was foreclosed.

Far from an instance of deceit and skullduggery, the handling of this situation by the University and the Medical Center evidences a spirit of compromise and accommodation that belies any fraudulent motive. From the University's perspective, it based its decision to hire two radiology residents on Dr. Wahby's statement to Dr. Rhodes that there was legitimate reason to believe funding would become available. Once it made the commitment to the match program, the University knew that there was a real chance that it would be required to pay the radiology residents out of its own pocket, even though they would be performing for the entire academic year at the Medical Center. The Veterans Administration, through the Medical Center, led it to believe that funding might come through even after the residents began working full-time at the Medical Center. It was not unreasonable and certainly not fraudulent for the University to include reimbursement for these residents' costs in its invoice to the Medical Center. It could safely assume that if funding had become available, it would be repaid; if the funding had not been approved, it would not be repaid for the residents.

For its part, the Medical Center worked actively to secure funding for a program it considered important and through its efforts, contributed to the University's belief that funding might become available; it believed that funding would become available and knew that was possible even after the onset of the academic year. In addition, when the University invoiced the radiology residents' costs, the Medical Center was in the best position to ascertain whether funding had been obtained. The Medical Center, moreover, had procedures in place to verify that very fact. Considering that the Medical Center had ready access to the necessary information and that the University assumed all the risk of securing the residents upon the Veterans Administration's assurances, it is difficult to paint the University as a defrauder.

We would be remiss if we failed to notice that the government has not been harmed here. Indeed, the Medical Center received the benefit of two full-time radiology residents at no cost. Admittedly, it was without $45,000 for a short term, but once the bookkeeping error was noticed, it was quickly corrected. Judging by the apparently satisfactory conclusion in the eyes of the Medical Center and the government's refusal to take up this action, it appears that no party to the incident believes any harm was done.

In conclusion, there is no false claim or fraud here. At most, the University was perhaps negligent in not ascertaining whether funding had been approved for the radiology residencies before it invoiced the Medical Center for its costs. But negligence is not actionable. Hindo's claim, therefore, fails.

■ With respect to Hindo's second claim, he purports to appeal the district court's dismissal of count III of his amended complaint on the grounds that it is barred by *res judicata*. In reality, however, Hindo admits that the district court's ruling was appropriate. His brief states: "Plaintiff concedes that the retaliatory demotion alleged in the Lake County case is barred by res judicata in this case." Hindo was forced to make this concession because the actions in both cases are identical. The Illinois Appellate Court characterized Hindo's complaint in the state case in the following manner: "In count I, plaintiff [Hindo] alleged defendants [the University] discharged plaintiff from his position as chairman of the department of radiology at the University in retaliation for reporting a suspected fraud against the ... Medical Center by University employees." 178 Ill. Dec. at 209, 604 N.E.2d at 465. That is the identical claim made in count III of his amended complaint in this case. The three requirements of applying the preclusive effect of *res judicata* are therefore met here: the identity of parties and the cause of action and a final judgment on the merits. *See, e.g., Prochotsky v. Baker & McKenzie*, 966 F.2d 333, 334 (7th Cir.1992).

■ Instead, Hindo, despite admitting count III of his amended complaint is barred, maintains that count III of his second amended complaint (for which leave to file was denied) states a viable claim not preclud-

ed by *res judicata.* His real challenge then is to the district court's decision to deny him leave to file the second amended complaint. We review such a claim for an abuse of the district court's discretion. *Sanders v. Venture Stores, Inc.,* 56 F.3d 771, 773 (7th Cir. 1995) (citations omitted). "Moreover, 'the denial will be overturned only if there was no justifying reason for it.'" *Id.* (quoting *Johnson v. Methodist Medical Center of Illinois,* 10 F.3d 1300, 1303 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2102, 128 L.Ed.2d 664 (1994)).

The circumstances of Hindo's motion to amend his complaint support the district court's decision to deny it. On September 22, 1993, the University filed a motion to dismiss count III of Hindo's amended complaint on the grounds that it was barred by *res judicata.* The discovery deadline was October 31, 1993. On November 3, 1993, while the district court was considering the University's motion to dismiss, Hindo filed a motion seeking leave to file a second amended complaint so that he could modify his count III.

Seeking to amend one's complaint when it appears that the current one is a sure loser is not unusual; nor is the denial of leave to file that amended complaint. Our recent opinion in *Sanders,* 56 F.3d at 774 (citations omitted), recites the litany of instances in which we affirmed a district court's denial of leave to amend a complaint where discovery has ended and a motion is pending for dismissal of the count or for summary judgment. A denial is particularly warranted in instances in which the plaintiff has failed to provide an explanation as to why the amendment did not take place sooner, and where the delay in granting the motion to amend would cause delay and burden the parties. *Id.* at 775. This is Hindo's case. Hindo (and other plaintiffs) are advised to take note of our admonition in *Sanders,* 56 F.3d at 775 (quoting William Shakespeare, Twelfth Night, II 42.), "In delays there lies no plenty." Given the timing of Hindo's motion to amend his complaint, we hold that the district court did not err in denying it.

For the foregoing reasons, the judgment below is

AFFIRMED.