84 F.3d 614
 Ronald HAYES, Plaintiff-Appellant,
v.
NEW YORK CITY DEPARTMENT OF CORRECTIONS, Captain James M.
Grillo, Captain Deborah Sutton, Assistant Deputy Warden
Howard Robertson, in their personal and professional
capacities as employees of the New York City Department of
Corrections, Defendants-Appellees.
 No. 1169, Docket 95-2625.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 28, 1996.
Decided May 24, 1996.
 
 Jeffrey G. Bullwinkel, New York City (Joseph F. Tringali, and Karla A. Cohen, Simpson Thacher & Bartlett, New York City, of counsel), for Appellant.
 Helen P. Brown, Office of the Corporation Counsel of the City of New York, New York City (Paul A. Crotty, Corporation Counsel of the City of New York, and Kristin M. Helmers, Office of the Corporation Counsel, New York City, of counsel), for Appellees.
 Before VAN GRAAFEILAND, MESKILL and WINTER, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 Plaintiff-appellant Ronald Hayes appeals from a decision of the United States District Court for the Southern District of New York, Martin, J., granting the defendants' motion for summary judgment and dismissing appellant's Eighth Amendment claims as to all defendants. We conclude that the district court erred in excluding portions of appellant's deposition testimony and in concluding that the protective measures undertaken by prison officials were reasonable as a matter of law. We reverse the decision of the district court and remand the cause for further proceedings consistent with this opinion.BACKGROUND
 
 
 2
 On June 25, 1991, appellant Ronald Hayes commenced this action pro se. Pursuant to 42 U.S.C. § 1983, Hayes sought compensatory and punitive damages as redress for defendants' alleged deliberate indifference to his safety during his incarceration at the House of Detention for Men (HDM), a high security facility on Rikers Island (Rikers) for approximately 1,200 men. He alleged that he suffered injury in connection with three attacks by other inmates at HDM on February 19, 1989, March 10, 1989, and April 2, 1989. Unless otherwise indicated, the following facts are undisputed.[1]
 
 
 3
 I. The Incidents of February 15, March 10 and April 2
 
 
 4
 Hayes arrived at Rikers in 1988. During the fall of 1988, he allegedly informed various Department of Corrections (DOC) personnel that he was in danger in HDM, that he was concerned about his safety and that he wished to be transferred. The DOC personnel did not ask Hayes to identify his enemies or take any other action to protect Hayes.
 
 
 5
 On or about February 12, 1989, Defendant Grillo, the HDM security captain with principal responsibility for security at Rikers, summoned Hayes to a meeting in his office with Gary Tillman, another inmate. The substance of their conversation is hotly contested and forms the crux of this appeal. The defendants do not refute Hayes' general allegation that he told Grillo that his life was in danger in HDM and requested a transfer. According to Hayes, however, he and Grillo specifically discussed Hayes' "[p]roblems with G [Gary Tillman] and his whole crew." Grillo refused Hayes' request for a transfer and, according to Hayes, he was warned that he would be held responsible if "anything [went] on" because Tillman had worked for Grillo for a long time and was a personal friend of his.
 
 
 6
 On February 15, 1989, Tillman and two other inmates, Terrence Campbell and Tasker Spruill, attacked Hayes, stabbing him in the back of the head, the temple, the right shoulder and the arm. Although Hayes refused to name his assailants to the investigating officer, Tillman, Campbell and Spruill were identified as "involved" in the investigating officer's "Unusual Incident Report." After this attack, the DOC issued separation orders for all of these inmates. The DOC also transferred Hayes, Tillman and Campbell out of HDM, and relocated Spruill to another block within HDM.
 
 
 7
 However, following an altercation during visitation with his wife on March 6, 1989, Hayes was transferred back to HDM to serve punitive segregation time within the Central Punitive Segregation Unit (CPSU). Upon his return to HDM, Hayes informed several DOC officials that he feared for his safety there. Several third persons, including another inmate, also expressed concerns for Hayes' safety to DOC officials. Mental health services workers also met with Hayes and documented that he was extremely frightened, was threatening suicide, and appeared to be a security problem.
 
 
 8
 On March 8, 1989, while under escort to religious services, Hayes attacked Shawn Grams, another inmate, with a razor. Neither Hayes nor Grams cooperated with the investigation of the incident. HDM officials did not issue a separation order or take any other protective measures.
 
 
 9
 On that same day, Hayes again met with Captain Grillo to discuss his safety concerns and request a transfer. Grillo declined to transfer Hayes, but warned him not to attend the Muslim services scheduled for the common area of HDM on March 10, 1989. According to Hayes, he indicated that he would attend the religious services.
 
 
 10
 On March 9, 1989, inmate Campbell was transferred back to HDM to serve time in CPSU. Pursuant to the separation order and DOC policy, Hayes and Campbell were housed in separate cell blocks of CPSU.
 
 
 11
 On March 10, 1989, Hayes attended religious services. When he left the services to use the restroom, Grams and Campbell assaulted him, stabbing him in the back, hip and face. Following this incident, a separation order was issued for Hayes, Grams and Campbell. Grams was transferred out of HDM, and Campbell was transferred to another block of CPSU where he was under 23-hour lockdown. Nevertheless, Hayes continued to complain about threats to his safety and to request a transfer.
 
 
 12
 On April 2, 1989, Hayes and Campbell encountered one another as Campbell was concluding a visit and Hayes was beginning one. Campbell ran at Hayes, slashing his face with a razor. Nine DOC officers sustained injuries while restraining Campbell. Following this incident, a new separation order was issued and a handcuff order was issued for Campbell. Eventually, Hayes was transferred to another facility.
 
 II. Procedural History
 
 13
 Acting pro se, Hayes engaged in limited discovery and submitted to a deposition in 1992 by defendants' counsel. At that deposition, Hayes testified that he had expressed his safety concerns at a February 12, 1989 meeting with Captain Grillo and another individual whom he could not identify by name at that time. Specifically, counsel asked him "Do you recall the name of the other individual?" He responded "Not off hand, but he was named in the attack. He wound up attacking me as part of the February 15th incident."
 
 
 14
 Counsel also questioned Hayes about the events following the first attack. Specifically, he asked:
 
 
 15
 Q. To the best of your recollection, what did you say about these warnings, in your own words?
 
 
 16
 A. I told them that I had enemies in H.D.M. and I had already been hurt here as a result of my enemies and it is not safe for me to be here.
 
 
 17
 Q. Did you name your enemies in H.D.M.?
 
 
 18
 A. I don't recall. I don't think so because I don't know everybody by name.
 
 
 19
 Q. Did you give any names of enemies, any particular enemies?
 
 
 20
 A. I don't recall.
 
 
 21
 Defense counsel did not ask Hayes whether he had identified his enemies in any other way or whether Hayes and Grillo had discussed the source of Hayes' fears.
 
 
 22
 On June 2, 1993, the district court appointed counsel for Hayes. Hayes' counsel thereafter conducted further discovery and agreed to a second deposition, subject to limitations. More specifically, the parties engaged in the following colloquy on the record of the August 11, 1993 deposition:
 
 
 23
 [Plaintiff's counsel]: [T]he deposition of April 15 '92 at Green Haven does not exist for purposes of trial or any other purpose related to this case. There's nothing admissible in that deposition that could be used later on.
 
 
 24
 [Defense counsel]: For purposes of trial, we agree.
 
 
 25
 Hayes' counsel failed to clarify the scope of the agreement.
 
 
 26
 At this second deposition, defense counsel again questioned Hayes regarding the February 12, 1989 meeting with Captain Grillo and a third individual. Hayes testified that the third individual was Gary Tillman and that he told Grillo at that time that he "had problems with G [Tillman] and other inmates," with "his whole crew," and that he believed his life was in danger in HDM. He also testified that Grillo told him that Grillo would hold him responsible if anything happened to Tillman because Tillman had worked for Grillo for a long time and was a personal friend of his.
 
 
 27
 On March 24, 1995, defendants moved for summary judgment contending that there were no genuine issues of material fact as to whether defendants were "deliberately indifferent" to Hayes' safety under the standards set forth in Farmer v. Brennan, --- U.S. ----, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In support of their motion, defendants submitted excerpts from both of Hayes' depositions. Because of ambiguity in the agreement regarding the first deposition and because of the failure of Hayes' counsel to clarify that agreement, the district court allowed the defendants to include the testimony from the first deposition in support of their summary judgment motion.
 
 
 28
 After considering both depositions together, the district court concluded that Hayes had altered his testimony in material respects--primarily as to whether he had identified his alleged enemies to prison officials. In other words, the district judge interpreted Hayes' second deposition as contradicting his first deposition and creating a material issue of fact where there was none prior to the second deposition. The court therefore disregarded the second deposition, at least to the extent that it filled the gaps of the first deposition with inconsistent testimony. Applying the summary judgment standard to the remaining facts, the district court concluded that the defendants initially lacked the requisite knowledge of a substantial risk to Hayes' safety and that after learning of the potential danger the defendants enacted reasonable measures to abate the risk of harm to Hayes.
 
 DISCUSSION
 
 29
 I. Conflicting Depositions on Summary Judgment
 
 
 30
 We review a grant of summary judgment de novo. Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir.1995). Summary judgment is proper only if "there is no genuine issue as to any material fact and when, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). All inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). Yet, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted).
 
 
 31
 In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. United States v. Rem, 38 F.3d 634, 644 (2d Cir.1994). These determinations are within the sole province of the jury. Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir.1994).
 
 
 32
 However, a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony. Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir.1969) (examining omission in four-day deposition); Martin v. City of New York, 627 F.Supp. 892, 896 (E.D.N.Y.1985) (examining direct contradiction between deposition and affidavit). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Perma, 410 F.2d at 578. Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not "genuine" issues for trial. Id.
 
 
 33
 Guided by these cardinal principles, we conclude that the district court erred in disregarding portions of Hayes' second deposition. In short, the circumstances in this case do not justify the court's refusal to consider portions of the second deposition.
 
 
 34
 First, the conflict in this case does not arise out of an affidavit crafted for the specific purpose of defeating a motion for summary judgment. It does not arise out of an affidavit at all. In Perma, we concluded that statements in an affidavit filed in response to a summary judgment motion could not create material factual disputes where none existed without such affidavit. We recognized that a deposition of a witness, subject to cross-examination, is generally more reliable than an affidavit submitted to oppose a summary judgment motion. 410 F.2d at 578. In this case, however, the conflict arises from a deposition taken long before the defendants filed their motion for summary judgment.
 
 
 35
 Second, the circumstances surrounding the deposition testimony in this case are significantly different from the circumstances surrounding the affidavit in Perma. In this case, Hayes was not represented by counsel at the first deposition. He had conducted only limited discovery pro se by the time of the first deposition. Moreover, as is apparent from the transcript, the first deposition was very brief. By the time of the second deposition, appellant had retained pro bono counsel and counsel had conducted significant discovery. Additionally, the second deposition was considerably lengthier than the first deposition. Contrast Perma, 410 F.2d at 577-78 (comparing affidavit with four-day counselled deposition).
 
 
 36
 Finally, the depositions in this case are only arguably contradictory. Contrast Martin, 627 F.Supp. at 896 (examining direct contradiction). Hayes testified at both depositions that he met with defendant Grillo and a third individual on February 12, 1989 to discuss his safety concerns. He testified at both depositions that this third individual was one of his attackers at the February 15, 1989 incident. At the second deposition, after further discovery, he identified Tillman by name. Although Hayes testified for the first time at the second deposition that he had informed defendant Grillo at the February 12, 1989 meeting that he felt threatened by Tillman and his "whole crew," there is nothing in the first deposition that directly contradicts this statement. Essentially, he testified at the first deposition that he did not recall the name of the inmate present at the meeting with Grillo. With respect to his conversations with DOC personnel upon his return to HDM on March 6, 1989, he testified that he did not recall whether he had identified anyone by name to DOC personnel because he did not know everyone by name.
 
 
 37
 In short, defense counsel did not ask questions at the first deposition sufficient to elicit the specific content of the conversation between Hayes, Grillo and Tillman at the February 12, 1989 meeting. With respect to the conversations with DOC personnel after the first attack, the two depositions are consistent. As a result, we cannot conclude that the two depositions are contradictory without drawing an improper inference as to appellant's credibility.
 
 
 38
 For all of these reasons, the district judge erred in discrediting portions of appellant's second deposition.[2] On these facts, the decision of the district court amounted to an improper assessment of credibility.
 
 II. The Merits of the Eighth Amendment Claim
 
 39
 The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Farmer, --- U.S. at ----, 114 S.Ct. at 1976. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. Morales v. New York State Dep't of Corrections, 842 F.2d 27, 30 (2d Cir.1988). However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.
 
 
 40
 The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. Farmer, --- U.S. at ----, 114 S.Ct. at 1977. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm. Id. at ----, 114 S.Ct. at 1984.
 
 
 41
 The district court concluded, and the defendants concede, that Hayes was incarcerated under conditions posing a substantial risk of serious harm. However, with respect to culpable intent, the district court concluded that the defendants lacked the requisite knowledge of risk to Hayes' safety prior to the February 15, 1989 attack, and that after that incident, the defendants took reasonable measures to abate the risk of harm. In determining that the defendants lacked requisite knowledge of the risk, the court relied primarily on its conclusion that Hayes did not identify his enemies to the defendants.
 
 
 42
 The district judge erred in concluding that there was not a material dispute with respect to the defendants' knowledge prior to the February 15, 1989 attack. First, we note that the issue is not whether Hayes identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to Hayes. Although a prisoner's identification of his enemies is certainly relevant to the question of knowledge, it is not, necessarily, outcome determinative. Second, accepting all of Hayes' deposition testimony as true, Hayes did identify the source of the threats to defendant Grillo. Moreover, the presence of Tillman at the February 12, 1989 meeting with Grillo requires, on summary judgment, the affirmative inference that Grillo was aware of the source of Hayes' difficulties. Although a jury ultimately could conclude, as did the district court, that Grillo believed Hayes was actually a threat to Tillman, the summary judgment standard requires the court to draw all inferences in favor of the non-moving party. Thus, there was a genuine issue as to a material fact, namely, the defendants' knowledge of a substantial risk of harm to Hayes. Because the record does not reveal any protective measures prior to the February 15, 1989 attack, summary judgment was improper.
 
 
 43
 However, the district court also erred in concluding that there was not a genuine issue as to the reasonableness of the defendants' protective measures after the February 15, 1989 attack. First, Hayes repeatedly expressed his fears to numerous DOC personnel and repeatedly requested a transfer. Although the defendants testified that DOC policy and practice permit special protective measures when an inmate provides specific identifying information regarding the source of a threat, other DOC officials testified that it is standard procedure to relocate an inmate whenever an inmate informs officials that his life is threatened.[3] Thus, without further evidentiary support, we cannot conclude that the decision not to transfer Hayes was reasonable as a matter of law.
 
 
 44
 Second, even short of a transfer, there is a genuine issue as to whether the defendants' protective measures were reasonable. The first attack was extremely violent, causing severe injuries to Hayes. Additionally, mental health workers had documented Hayes' agitated mental state after the first attack and concluded that he presented a security risk. Nevertheless, despite the first altercation between Hayes and Grams, DOC officials failed to issue a separation order for the two. Moreover, despite the known risk to Hayes after the February 15, 1989 attack, Hayes was not under escort when he was attacked on March 10, 1989. Under these circumstances, it is difficult for us to conclude that the defendants' protective measures were so significant as to be reasonable as a matter of law.
 
 
 45
 In short, the reasonableness of the defendants' actions in this case is suitable for resolution by a jury at trial. Thus, the district court erred in granting the defendants' motion for summary judgment and dismissing appellant's Eighth Amendment claim as to all defendants.[4]
 
 CONCLUSION
 
 46
 The decision of the district court granting defendants' motion for summary judgment and dismissing the action as against all defendants is reversed and the cause is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 The defendants do not refute the underlying facts as testified to by Hayes. Rather, the defendants refuse to credit portions of Hayes' deposition testimony. Because we conclude, infra, that the district court erred in excluding portions of Hayes' deposition testimony, our recitation of the facts credits all testimony in deciding this appeal from summary judgment
 
 
 [2]
 In light of our disposition of this issue, we need not decide (1) whether a district judge ever may exclude deposition testimony when the testimony contradicts earlier sworn testimony, or (2) whether it was improper for the district court to consider, on summary judgment, a deposition which the parties agreed was not available for purposes of trial
 
 
 [3]
 The record demonstrates, for example, that when inmate Tillman reported a threat from an unknown individual to DOC security and stated that he feared for his life, defendant Grillo authorized Tillman's transfer that very day. The record also demonstrates that DOC officials have transferred prisoners from one punitive segregation unit to another and that DOC officials are authorized to create new punitive segregation units when necessary
 
 
 [4]
 We note that the district court did not consider the defendants' motion for summary judgment on a defendant-by-defendant basis. Accordingly, we limit our review to the conclusions of the district court