**UNITED STATES of America EX REL. Charles V. FARRELL, Plaintiff/Relator,**

v.

**SKF USA, INC. d/b/a MRC Bearings, Defendant.**

**No. 94–CV–7157 CJS.**

United States District Court, W.D. New York.

March 7, 2002.

Andrew P. Fleming, Chiacchia & Fleming, LLP, Hamburg, NY, for relator.

Joseph V. Sedita, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for defendant.

### Decision and Order

SIRAGUSA, District Judge.

#### INTRODUCTION

This *qui tam* action is brought by plaintiff/relator, a former employee of defendant, claiming that defendant violated the False Claims Act, codified at 31 U.S.Code § 3729 *et seq.*, by presenting false claims for payment for aerospace bearings. Relator alleges that the bearings were not tested, cleaned, preserved and/or packaged for shipment in accordance with military specifications as required in the contracts between defendant and the U.S. government, as well as other contractors who utilized the bearings to provide goods to the government as an end-user. The case is now before the Court on relator's motion for partial summary judgment and defendant's motion for summary judgment. After considering the papers filed in support of and opposition to the two motions, along with lengthy oral argument on October 25, 2001, the Court grants relator's motion for partial summary judgment (finding that MIL–P–197 was applicable to defendant) and grants defendant's motion for summary judgment, dismissing the case.

#### BACKGROUND

Relator was an employee of SKF USA, doing business as MRC Bearings ("MRC" or "defendant") as a senior quality assurance supervisor until June 1993. On May 14, 1993, MRC became aware of problems with the cleaning and preservation tanks and the packaging systems at its plant. This occurred when Jeffrey Kelly, a quality assurance representative for Pratt & Whitney Canada, who had a permanent office at MRC's plant in Falconer, New York, informed defendant's employee, Alan Lamb, that Pratt & Whitney had detected cleanliness problems with certain MRC bearings. Lamb and Kelly investigated and found problems in MRC's "white room." They discovered that certain cleaning tanks in the white room were dirty. Lamb paged relator and that was the first time relator learned of the problems. Subsequent to being informed of the situation, defendant, more specifically, discovered problems with bearing cleanliness for bearings it manufactured from February 1991 through June 1993.

Relator told MRC management that, notwithstanding that MRC cleaned its tanks and replaced the solvents, oils, and greases, MRC also had a duty under the military specification MIL–P–197 to notify its customers of the problem. Such customers included not only the U.S. government, but also included customers who provided end products to the government made with MRC bearings. MIL–P–197 is a military specification entitled "Packaging of Bearings, Antifriction, Associated Parts and Subassemblies." It is a process specification that was part of nearly all MRC contracts at issue for the period of February 1991 to June 1993. Relator contends that MRC did not comply with MIL–P–197 testing and bearing cleanliness standards for the period; submitted government DD–250 payment voucher forms asserting that MRC *had* complied with MIL–P–197; and failed to follow contract specification obligations requiring MRC to notify the government of non-conforming products.

In July 1993, defendant notified, among others, the Defense Contract Management Command in Buffalo, New York ("DCMC–Buffalo") and General Electric ("GE"), another of its customers, of the MRC bearing cleanliness problems. The notification in the case of DCMC–Buffalo consisted of a letter defendant sent stating in part that, "[r]esults of contamination tests on bearings taken from stock and which were packaged between 2/91 and 5/93 indicated

that the cleanliness level of bearings was slightly below MRC's expectation." G. Selden letter to DCMO–Buffalo (Jul. 16, 1993) at 1. Subsequently, in August 1993, MRC told GE that a certain number of packaged bearings failed MRC's tests because of the presence of abrasive-laden contaminates in the preservative oil and grease used in the packaging.

## DISCUSSION

### Summary Judgment Standard

The law on summary judgment is well settled. Summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial obligation, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat a motion for summary judgment, or in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187

(5th Cir.1991); Fed.R.Civ.P. 56(f). Once the moving party has met its burden, mere conclusions or unsubstantiated allegations or assertions on the part of the opposing party are insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986).

The court, of course, must examine the facts in the light most favorable to the party opposing summary judgment, according the non-moving party every inference which may be drawn from the facts presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Maguire v. Citicorp Retail Services, Inc.*, 147 F.3d 232, 235 (2d Cir.1998). However, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir.1996).

### Subject Matter Jurisdiction

██ The False Claims Act is a Civil War statute, amended once in 1943 and again in 1986. It provides for criminal and civil penalties for presenting a false claim against the United States. From its enactment, it has carried a *qui tam* provision, short for *qui tam pro domino rege quam pro se ipso in hac parte sequitur* ("Who brings the action for the King as well as for himself"). *See United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 857 (7th Cir.1999). The 1986 amendments added a "jurisdictional"[1] bar to *qui tam* actions to protect against para-

---

1. The Seventh Circuit commented in *United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 859 (7th Cir.1999) (quoting *United States ex rel. Precision Co. v. Koch Indust.*, 971 F.2d 548, 551 (10th Cir.1992)), that regardless of whether the statutory bar is properly considered to be "jurisdictional," "it is plain that in fact 'satisfaction of § 3730(e)(4) is ... an issue of subject matter jurisdiction.'"

sitic lawsuits. *Id.* at 858 (citation omitted). The purpose of the *qui tam* provision is "to encourage and reward the exposure of fraud against the government...." *Id.* at 859.

In its motion, defendant contends that relator's allegations fail to meet the "subject matter jurisdiction" requirements of 31 U.S.Code § 3730(e)(4). That section provides in part that,

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations of transactions in a criminal, civil, or administrative hearing, in a ... congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

Section 3730(e) also contains a definition of "original source." That definition is,

(4)(A) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

Defendant contends that relator has failed to prove subject matter jurisdiction under this section by a preponderance of the evidence. Defendant argues the record makes clear that this suit "is based upon allegations of fraud which were the subject of an extensive administrative investigation which was 'publicly disclosed' as that term is used in the statute." Memorandum of Law in Support of Defendant's Motion for Summary Judgement ("Defendant's Memorandum") at 24–25. Defendant maintains that Jeffrey Wickwire, one of the government's quality assurance representatives, investigated the contamination issue for the purpose of determining whether the bearings violated any contract specifications during mid-May 1993. Defendant states that Wickwire's investigation shows that the public officials who had managerial responsibility for the "very claims being made," constituted a public disclosure, citing *United States ex rel. Mathews v. Bank of Farmington,* 166 F.3d 853 (7th Cir.1999) in support.

On the other hand, relator responds that *he* was the source of information about the bearing cleanliness problems to DCMC's Quality Assurance Branch Chief, Dennis Orcutt, Wickwire's supervisor, in a telephone call to Orcutt on July 12, 1993, and the source of information for G.E. Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Relator's Opposition Memorandum") at 6. Relator also contends that defendant understated the extent and severity of the problem, thereby misleading Wickwire and Orcutt. Relator relies on cases holding that notice of a contract violation to "low level governmental officials" is insufficient to avoid liability under the False Claims Act. *See United States ex rel. Mayman v. Martin Marietta Corp.,* 894 F.Supp. 218, 223–224 (D.Md. 1995); *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148 (2d Cir.1993).

The threshold question is whether the bearing cleanliness problems were publically disclosed. Relator does not dispute that it was Kelly of Pratt & Whitney Canada who first brought the problem to MRC's attention on May 14, 1993. *See* Statement of Undisputed Facts ("Defendant Statement") at ¶ 13; Rule 56 Statement in Response to Defendant's Statement of Undisputed Facts at ¶ 2. Nor,

does Relator dispute that MRC notified Wickwire, the resident government quality assurance representative, on May 14, 1993. *Id.* at ¶ 23. Rather, relator contends that defendant misled the government as to the extent of the problems. On this point, relator also relies on the July 16, 1993 letter of Gary Selden, defendant's quality assurance manager, to DCMO–Buffalo (Jul. 16, 1993) at 1.[2] In this correspondence, Seldon revealed only that "[r]esults of contamination tests on bearings taken from stock and which were packaged between 2/91 and 5/93 indicated that the cleanliness level of bearings was *slightly below* MRC's expectation," (emphasis added). This was a gross understatement of the problems and even implied that the bearings still met military specifications, but fell short only of MRC's own specifications. Selden's cleverly worded letter obscured the issue of whether the bearings violated military specifications, as is borne out by Orcutt's deposition testimony, in which he stated that it was not until receiving relator's information that he understood the degree of the contamination. *See* Orcutt dep. at 102. Selden also told Orcutt, during his July 13, 1993 visit to defendant's plant in Jamestown, New York, that 11 out of 32 pieces tested (34.4%) failed; yet, he told G.E. that 21 out of 32 pieces tested (65.6%) failed. *See* Fleming aff.[3] at ¶ 22. In this regard, Or-

cutt testified that after receiving Seldon's letter, he received information from relator that influenced his understanding of the degree of the contamination. He stated,

> [t]here was the comment [slightly below expectations], there was Mr. Farrell's [relator's] phone calls and visits to me. There was a lack of knowledge on my part to what degree this thing was. There was a lack of knowledge on our part as to the degree of contamination and the types of indications, linear indications ... [l]ength of a piece of contamination.

Orcutt dep. at 102.

Further, Orcutt testified, in response to relator's counsel's questioning, that despite MRC's tests after learning of the contamination problem, MRC had a continuing duty to test all the materials used in the manufacture of these precision bearings. Orcutt dep. at 232. MRC had an obligation to see that contamination was at or under the allowed contamination in MIL–P–197. *Id.* at 233. Finally, Orcutt concluded that MIL–P–197 would apply to defendant if it was a condition of the contracts between the government and defendant for the manufacture of the bearings. *Id.* at 233.

Based on the evidentiary submissions, the Court agrees with relator's position that although the existence of the bearing

2. Relator's papers show other evidence that defendant was not diligent in correcting the problem as it applied to the government contract. Specifically, an interoffice memorandum dated May 18, 1993, from defendant's Gordon Johnston, *non*-Pratt and Whitney Canada products were subject to random testing to determine the need for rewashing and repackaging. However, as referred to in that memorandum (at its paragraph 3) and as clearly shown by an interoffice memorandum dated May 21, 1993, all Pratt and Whitney Canada products were to be rewashed, cleantested and represerved prior to shipment. Following that, it was then subject to random

testing for cleanliness. Flemming aff. at 16, Exhibits B & C. However, no information is before the Court that these memoranda reached outside defendant's corporation until this suit.

3. Relator Farrell has submitted an affidavit adopting his counsel's affidavit as his own and verifying the information in his amended complaint. *See* Farrell aff. (Oct. 1, 2001) at ¶¶ 3–4. The Court is satisfied that Farrell's affidavit provides the basis for using his counsel's affidavit and the verified amended complaint as evidentiary proof in admissible form. *See* Fed.R.Civ.P. 56(e).

cleanliness problems was revealed to the government, the extent and degree of the problems were not. The Court further agrees with relator that *he* was the original source of information pertaining to the degree and extent of such problems. Therefore, the limitations on the Court's jurisdiction, set out in 31 U.S.Code § 3730(e)(4), do not apply. *See United States ex rel. Mathews,* 166 F.3d at 858 ("[t]he jurisdictional bar arises only if the information upon which the *qui tam* claim is based has been publicly disclosed and the plaintiff was not the original source of the information.").

### *Relator's Motion for Partial Summary Judgment*

Relator asks the Court to make a ruling as a matter of law that MIL–P–197 was applicable to defendant. *See* Memorandum of Law ("Relator's Memorandum") at 4. Since defendant, at oral argument, conceded that MIL–P–197 does apply to the bearings in question, the application is granted.

### *Defendant's Motion for Summary Judgment*

■ Defendant's position is that, notwithstanding the applicability of MIL–P–197, it has never violated any contract specifications and that the very governmental officials whose positions required them to make that determination came to the same conclusion. *See* Defendant's Memorandum at 7–10. Defendant cites testimony from the government's quality assurance representative at the plant, Wickwire, his superior at DCMC–Buffalo, Orcutt, Orcutt's superior, Major John Pritchard, and *his* superior Colonel David L. Sims. Each of these government representatives came to the conclusion that defendant had *not* violated any specifications of their contracts. *Id.* Relator argues they all are wrong in their interpretation of the extent of the military specification's applicability to defendant's bearings.

The False Claims Act reads in relevant part:

(a) Liability for certain acts.—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

(b) Knowing and knowingly defined.— For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

(c) Claim defined.—For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Govern-

ment provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.Code § 3729(a), (b) & (c).

Relator, in effect, conceded at his deposition, that prior to May 14, 1993, defendant was not involved in making any false claims. Farrell dep. at 214. The specific pertinent questions and answers were:

Q. Now, let's go to the period before May 14th, 1993. Is it your position, Mr. Farrell, that at that time the company was involved in perpetrating a fraud on the government?

A. Prior?

Q. to May 14th, 1993.

A. No, it was not.

Q. Okay. That in your own mind the company was not making false claims on the government prior to that time, correct?

A. In my mind and to the best of my knowledge, no.

Farrell dep. at 214. Later, in the same deposition, he reaffirmed his stated position, that defendant was not involved in any false claim prior to May 14, 1993. *See* Farrell dep. at 217. Farrell returned to this issue still later in his deposition when he stated that, "[t]here may have been a violation but I don't think it was intentional." Farrell dep. at 401. Defendant's counsel followed-up with questions to which Farrell replied:

Q. Okay. And do you think the company was behaving recklessly prior to that time [May 14, 1993]?

A. No, sir.

Q. Or with any kind of deliberate head in the ground ignorance?

A. No.

Farrell dep. at 401.

Federal Rule of Evidence 801(d)(2) discusses the admissibility of an admission by a party opponent. Such a statement is admissible if it is offered against a party and is the party's own statement, in either an individual or a representative capacity. Clearly, relator's statement fits that definition and the Court finds, as a matter of law, that it is admissible and that it severely undermines relator's case against defendant. In essence, relator and each of the government representatives, from Colonel Sims on down to the field representative at defendant's plant, all believe that defendant did not intentionally, recklessly or with deliberate ignorance, submit any false claims to the government prior to May 14, 1993. The Court finds that the evidentiary proof necessarily limits the period of the alleged false claims to that period after discovery of the contamination problem, that is, after May 14, 1993.

As to the period after May 14, 1993, defendant stated at oral argument that after May 14, 1993, MRC shipped no dirty bearings. Defendant states that on the day of the discovery, the line producing the bearings was shut down and the contaminated tanks cleaned. MRC informed[4] the government representative of the problem, providing further details as their investigation progressed. Wickwire dep. at 30. The in-house representative for Pratt and Whitney, the company that originally alerted MRC to the bearing cleanliness issue, participated in the task force MRC created to address the problem and the government quality assurance representatives were copied on the minutes of that

---

4. However, as the Court stated above, defendant obscured the extent of the problem to the government.

task force. Kelly dep. at 32–33. Relator agreed that the cleaning tanks at issue were cleansed, their filters changed and testing was done to determine whether they were contaminated. Kelly dep. at 26; Farrell dep. at 110, 195; Lamb dep. at 23. Where relator takes issue with defendant is on whether defendant's post-contamination discovery actions were adequate.

That is, relator argues that defendant had an obligation not only to clean the tanks, but also to inform its customers of the problem and failed to do so completely, or, did so without the requisite candor. Complaint at ¶¶ 9, 14, 15, 25. Defendant contends that its claim to the government was complete once it submitted the DD 250 form, Material Inspection and Receiving Report, and that there was no knowing false claim. Thus, it argues, a failure to notify its customers does not equate to a false claim. Relator responds that the false statement was in the letters MRC sent out understating the problem. Further, relator contends that defendant's failure to follow-up with extensive testing and full notification to government contracting representatives constituted violations of the False Claims Act. *See* Amended Complaint at ¶ 36–42. The Court disagrees.

As discussed above, the Court finds that the only claims that remain at issue are the ones submitted by defendant subsequent to May 14, 1993, after the cleanliness problem was identified. Clearly, no knowing false claim was submitted prior to May 14, 1993. As previously indicated, relator has admitted as much, and the other evidence supports this conclusion. As to the letter and representations Selden made on defendant's behalf to the government after May 14, 1993, the Court dis-

agrees with relator's characterization of those representations as fitting within the definition of claims. As was made clear at oral argument, the claims had already been submitted prior to May 14, 1993, and payment made. After May 14, 1993, defendant submits that it followed the military specifications for tank cleanliness and inspections. Relator, at his deposition, agreed. *See* Farrell dep. at 119, 195. He stated that only conforming products were being shipped after May 14, 1993, and that products which had been preserved prior to May 14, 1993, were tested on a lot by lot basis, those found dirty were rewashed and represerved. *Id.* Selden's obfuscation took place after the claims had been submitted and paid and were not made to "to get a false or fraudulent claim paid or approved by the Government." *See* 31 U.S.Code § 3729(a)(2).

Therefore, the Court finds as a matter of law that no material issue of fact precludes summary judgment for defendant and the evidentiary proof in admissible form shows conclusively that defendant is entitled to judgment on the claims asserted by relator under 31 U.S.Code §§ 3729(a)(1), (2) and (3).[5] Though defendant's acts might constitute a contract violation, they did not violate the False Claims Act.

### *Relator's Wrongful Termination Claim*

██ Relator also plead a cause of action under the False Claims Act's "whistle blower" provision. *See* Amended Complaint at ¶¶ 44–47. That statute provides:

(h) Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of

---

**5.** 31 U.S.Code § 3729(a)(3) allows recovery by a relator for a conspiracy to obtain payment for a false claim. Relator has not alleged any members of a conspiracy or acts in furtherance of a conspiracy. Defendant has met its burden to show that relator's proof is insufficient to carry the non-movant's burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection

31 U.S.Code § 3730(h). The Third Circuit has held that,

the False Claims Act also requires employees to prove they were discriminated against because of their "protected conduct." To meet this requirement, a plaintiff must show his employer had knowledge that he was engaged in "protected conduct" and that the employer retaliated against him because of that conduct. Several courts of appeals have held that the knowledge prong of § 3730 liability requires the employee to put his employer on notice of the "distinct possibility" of False Claims Act litigation. *Yesudian,* 153 F.3d at 740; *Childree,* 92 F.3d at 1146; *Hopper,* 91 F.3d at 1269; *Neal,* 33 F.3d at 864. We agree with this formulation.

*Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 188 (3d Cir.2001).

Both relator and defendant agree on the following facts relative to relator's claim of wrongful termination. After a meeting on June 4, 1993, relator was upset with his supervisor, Anthony DelSignore, because

DelSignore denied relator's request that defendant's customers be notified about the bearing cleanliness problem. Following this meeting, relator scheduled a meeting with David Lewandowski, defendant's director of human resources. The meeting with Lewandowski was to take place on Monday, June 7, 1993. However, on Sunday, June 6, 1993, relator came to the plant and removed his personal effects from his office. He then drafted a letter of resignation, which he brought with him to the Monday meeting with Lewandowski. The general tone of the letter is one of regret, that is, relator writes regretting the deterioration of the management's support for product quality. *See* Charles V. Farrell letter to David Lewandowski (Jun. 7, 1993) (attached as Exhibit O to Sedita decl.). The closing paragraphs are as follows:

Current events, however, have put me in a position that I can no longer support MRC. Tony DelSignore has completely and totally demoralized my department, my supervisors, and myself with his continued unreasonable objectives, constant verbal assault and the threat of being fired, in addition to the questionable stances that he takes with regard to product quality as interpreted by him. It has come to the point that I cannot win, if I disagree with a position that he takes I'm being radical and "not supporting the organization", if I agree it's interpreted as "malicious compliance", although this is quite contrary to what I have stated in all my performance reviews which have been conducted by no less than five (5) different Plant Managers.

It is therefore with much regret that I am forced to tender my resignation as I am being put in a situation that I cannot ethically or morally support, nor can I sit by and watch the continued deterioration of the inspection and quality systems.

*Id.* Relator, when deposed, testified that it was his intent on June 7, 1993, to either have the customers notified by defendant of the contamination problem, or give the letter to Lewandowski and resign, then notify the customers himself. Farrell aff. at 276. However, on June 7, when relator met with Lewandowski, he did not give him the letter of resignation. *Id.* Relator subsequently testified that,

> The only reference to anything regarding my continued [*sic.*] or terminating of my employment was that I told Mr. Lewandowski that the customers were going to be notified, that either MRC SKF [defendant] could accomplish that or they could have my resignation and I would accomplish that and if he wanted the resignation I had a copy of it ready to sign right there. Dave Lewandowski assured me that that would not be necessary, that he would get with Mr. Bozogan and Mr. Nilsson and Mr. DelSignore and would get back with me on what the result was to this issue.

Farrell dep. at 277–78.

In his Supplemental Responses to Interrogatories (a copy of which is attached as Exhibit K to Sedita decl.), at 1, relator stated that, "with his words and actions in June of 1993 that he communicated to David Lewandowski that if the Defendant were to take appropriate corrective action regarding the problems identified in [Relator's] Complaint herein that [Relator] would desire to keep his employment with Defendant." However, Lewandowski testified that relator told him "that [relator] felt he needed to resign his position." Lewandowski aff. at 35. Lewandowski testified that relator resigned, "because he had a manning level dispute with his supervisor." *Id.*

Relator contends there is a material question of fact precluding summary judgment on this cause of action: "[t]he issue is, did [relator] lose his employment as a result of his insistence that he could not be a part of a cover-up of a serious problem at the MRC plant." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (# 124) at 9. However, as defendant points out in his memorandum, the record contains no evidence that relator was asked to participate in a "cover-up." Reply Memorandum of Law in Further Support of Defendant's Summary Judgment Motion (# 129) at 8. Relator conceded at his deposition that he, for reasons unrelated to the False Claims Act, did not notify Jeff Wickwire, the government's quality assurance representative, about the cleanliness problem. When asked why, he responded:

> As with most problems or issues that popped up within MRC we're big boys, we take care of our own problems. We fix the customer up and we move on with business. There was no need for me to sit down with Jeff and say we have this problem. I figured we would take care of the problem.

Farrell dep. at 205. Additionally, relator's own testimony belies his suggestion that he was forced into a cover-up:

> Q. Mr. Farrell, you could have informed the customers at anytime without quitting couldn't you?
>
> A. Not necessarily. Well, yes, sir, I could have sat at home and called every night. I probably could have done that. Typically I would expect somebody in the company to stand up and say that this is the right thing to do.
>
> Q. You were right across the hall from Mr. Wickwire, weren't you?
>
> A. Yes.
>
> Q. You could have walked over and talked to him couldn't you?
>
> A. I could have, yes.
>
> Q. Was there a rule against talking to him?

A. No, there was not.

Q. Any reason why you didn't walk across the hall and just tell him, I've got a concern, I think this is a bad process going on here?

Farrell dep. at 283–84.

Defendant has adequately shown that relator's evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Therefore, defendant is entitled to summary judgment on the wrongful termination cause of action.

CONCLUSION

In light of the above, the Court grants relator's motion for partial summary judgment (# 117) and holds, as a matter of law, that MIL–P–197 was applicable to defendant. However, the Court also grants defendant's motion for summary judgment (# 112). The Clerk is directed to enter judgement for defendant and close this case.

IT IS SO ORDERED.