In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-2676 & 10-3599

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARSHALL PECORE AND
CONRAD WANIGER,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 07-C-316—**William C. Griesbach**, *Judge.*

ARGUED SEPTEMBER 22, 2011—DECIDED DECEMBER 30, 2011

Before BAUER, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge*. After a six-year investigation, an additional two-and-one-half years of discovery and pre-trial posturing, and a nine-day jury trial, Marshall Pecore and Conrad Waniger (the "defendants") prevailed against civil charges that they violated the False Claims Act ("FCA"). Unsatisfied with just the trial victory and perhaps disturbed that the government spent nearly a decade chasing about $75,000, the defendants moved for

attorney's fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A), or alternatively, sanctions under Rule 37(c)(2) of the Federal Rules of Civil Procedure. The district court denied both motions. Despite our discomfort with what looks like government overreaching, we find that the district court's ruling was not an abuse of discretion and accordingly, we affirm.

## I. BACKGROUND

The origins of this dispute date back to 2000 when Menominee Tribal Enterprises ("Menominee," "MTE," or the "Tribe"), the principal business arm of the Menominee Indian Tribe of Wisconsin, first applied for and received federal funding under the Hazardous Fuels Reduction program ("HFR"). The federal Bureau of Indian Affairs ("BIA") created HFR as a long-term strategy to gradually reintroduce the beneficial aspects of fire into fire-dependent ecosystems such as densely-wooded forests. To obtain HFR funds, an applicant is required to first submit a proposal for its planned fire reduction work. Unlike previous federal programs, this fire reduction program required approved applicants to request BIA reimbursement only after incurring project costs.

In 2000 and again in 2001, Menominee forest manager Marshall Pecore, and Menominee fire management officer Conrad Waniger, applied for HFR funding on behalf of the Tribe. The application sought federal funds to grade 141 miles of forest roads and to create an additional

273 miles of fuel breaks.[1] To create these fuel breaks, MTE's application represented that it would remove excess vegetation by performing brushing and disking work. As its name implies, brushing removes potentially flammable brush near a forest road. Disking, on the other hand, is the process of mixing organic soil with forest vegetation to eliminate the continuity of vegetation on the forest floor. After obtaining BIA approval, Menominee began HFR work in December 2000, and began invoicing BIA in 2001. Early MTE invoices requested BIA reimbursement totaling a flat fee of $450 for each mile of fuel-break work. As work progressed, MTE abandoned its per-mile, fixed-fee invoices in exchange for invoices that requested reimbursement for actual costs incurred. The purpose of this change was hotly disputed during trial.

The government claimed that problems with the Tribe developed in June 2001, after several MTE staff members told Dave Congos, the BIA forester assigned to the Tribe, that MTE's Roads Department budget was running a deficit. Menominee employees reported that the Tribe purposefully diverted HFR funds to the Roads Department as a way to close the budget shortfall. Prompted by these reports, Congos and Thomas Magnuson, another BIA forester, personally inspected some of the work MTE claimed to have completed. Congos

---

[1] A fuel break is a strip of land cleared of potentially flammable vegetation that runs parallel to a forest road. Among other benefits, an effective fuel break provides a defensive area for firefighters.

and Magnuson walked the forest roads and compared their observations of work performed to a map prepared by MTE that purported to show completed and invoiced work. Both Congos and Magnuson concluded that the submitted invoices overstated the actual work done. In some cases, Congos felt that the work performed actually increased the risk of fire. Congos reported his findings to his supervisor and discussed the results with Waniger, who agreed to rework certain portions of the forest.

Following their initial meeting in 2001, Waniger submitted revised maps to Congos that again purported to show portions of the forest where HFR fire prevention work had been completed and invoiced. In one memorandum submitted by Waniger documenting 2001 fire reduction accomplishments, Wangier claimed that fuel breaks were created for 96.2 miles. Of those 96 miles, 54 miles were fully completed and the remaining 42 miles were 95% complete. Maps and memos in hand, Congos inspected Tribal grounds for a second time to determine whether the actual work performed reconciled to what MTE had billed. Congos's inspections confirmed his belief that the defendants were submitting false invoices for work that was never completed or completed in a way that did not meet HFR standards. This inspection, in part, subsequently served as the basis for the government's False Claims Act suit.

In July 2002, Congos and Magnuson contacted Joseph Schwartz in the Office of Inspector General ("OIG") for the Department of Interior. Based on

Congos's report, Schwartz initiated an investigation into Menominee's billing practices that included employee interviews and a review of subpoenaed records. During the investigation, the government also identified what it believed were instances of falsified time cards relating to HFR funds. Namely, the government alleged that Tribe management required certain employees to code time worked to fire reduction efforts even though these employees were actually working on unrelated projects.

By 2005, the government formally contacted MTE to discuss the results of the OIG investigation. Throughout the next several months, the parties communicated regularly and even appeared close to a settlement. But in 2006, the defendants refused the government's settlement offer and broke off negotiations. At that time, the defendants maintained their innocence and principally argued that the allegations were all one big misunderstanding. Had government investigators spent more time discussing the allegations with Pecore and Waniger, the defendants argue that the protracted litigation could have been avoided.

With a settlement off the table in April 2007, the United States filed suit against MTE, Pecore, and Waniger alleging violations of the FCA, 31 U.S.C. §§ 3729-33. MTE, Pecore, and Waniger all filed motions to dismiss. The district court denied the motions as to Pecore and Waniger, but granted MTE's motion because it was not a "person" within the meaning of the FCA. Subsequently, the district court rejected the remaining defendants' and the government's partial motions for summary judgment.

At trial, the defendants claimed that the government was unclear about the standard fuel-break width it would use to evaluate whether MTE complied with HFR protocols. The defendants construed this silence and subsequent confusion about the fuel-break standard as evidence of a simple misunderstanding rather than evidence that the defendants knowingly submitted false invoices. There was further confusion about whether Menominee employees were properly recording time to HFR projects. The defendants conceded that one employee had truly misclassified his time, but this fabrication was nothing more than an isolated anomaly. All other time-card discrepancies were really a proper internal-reporting scheme designed to reclassify time between certain departments. Again, had the government investigators explicitly discussed these discrepancies with the Tribe, there would have been no need for litigation. The defendants considered their ace-in-the-hole to be a 2009 inspection prepared by Ken Sloan, a retired forester.[2] The defendants hired Sloan to independently inspect portions of the forest to determine whether

---

[2] The defendants submitted the Sloan report shortly before trial, but after the discovery period had closed. The government vigorously argued that the report should be excluded from trial on the grounds that the defendants had violated a discovery order. The district court noted the violation but ultimately accepted the evidence to "ensure a full record and protect the Defendants themselves from the arguably deficient performance of their attorney." *United States v. Menominee Tribal Enters.*, No. 07-C-316, 2010 WL 2465505, at *4 (E.D. Wis. June 15, 2010).

Menominee had actually conducted appropriate brushing and disking work between 2000-2002. In response, the government conducted its own reinvestigation in October 2009. Congos testified at trial that the Sloan photographs showed some evidence of cutting, but that it was not evidence of cutting related to the HFR program. Additionally, Congos testified that other locations evaluated by Sloan continued to show no signs of *any* fire prevention work.

At the close of the government's evidence, the defendants moved for judgment as a matter of law, which the district court denied. After a nine-day trial, the defendants' theory prevailed. Following their trial victory, the defendants moved for attorney's fees under EAJA or alternatively, sanctions under Rule 37(c)(2). The district court denied both motions, and the defendants filed this timely appeal.[3]

---

[3] Ten days before oral argument, the defendants requested that we take judicial notice of various letters and memoranda that purportedly illustrate Congos's bias against defendants Pecore and Waniger. The defendants interpret this bias as the real reason the government brought suit. Although we are skeptical that documents defense counsel inadvertently failed to include in the record are the proper subject of judicial notice, we offer no opinion on this matter because these documents do not change our conclusion that the district court did not abuse its discretion in finding substantial justification for the government's position.

## II. ANALYSIS

Pecore and Waniger present two related issues for our review. The defendants first contend that the district court erred by rejecting their post-trial motion for EAJA attorney's fees. Similarly, Pecore and Waniger challenge the district court's refusal to impose Rule 37 sanctions against the government. We review both of the district court's decisions for an abuse of discretion. *Pierce v. Underwood*, 487 U.S. 552, 559-60 (1988) (reasoning that in EAJA cases, "the district court may have insights not conveyed by the record, into such matters as whether particular evidence was worthy of being relied upon, or whether critical facts could easily have been verified by the Government."); *Johnson v. Kakvand*, 192 F.3d 656, 661 (7th Cir. 1999) (finding that Rule 37 decisions are reviewed deferentially because "[d]istrict courts possess wide latitude in fashioning appropriate sanctions and evaluating the reasonableness of the attorneys' fees requested").

*A. EAJA Attorney's Fees*

The defendants principally contend that the district court abused its discretion by rejecting their motion for EAJA attorney's fees. A district court may award such fees where "(1) the claimant is a prevailing party; (2) the government was not substantially justified in its position; (3) no special circumstances make an award unjust; and (4) the fee application is timely and supported by an itemized statement." *Conrad v. Barnhart*, 434 F.3d 987, 989 (7th Cir. 2006) (quotation marks omitted); 28 U.S.C.

§ 2412(d)(1)(A). Here, the defendants only challenge the district court's finding related to the second element: whether the government was substantially justified in bringing the FCA action. The government bears the burden of proving that its position was substantially justified, and to do so, it must show: "(1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory propounded; and (3) a reasonable connection between the facts alleged and the theory propounded." *Conrad*, 434 F.3d at 990; *see also Golembiewski v. Barnhart*, 382 F.3d 721, 724 (7th Cir. 2004). In evaluating the government's position, we review the claim in its entirety rather than the individual positions the government may have taken throughout different phases of litigation. *Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 161-62 (1990).

With that, we turn to the defendants' argument on appeal, which cites three sets of uncontested facts that purportedly prove that the government's case lacked substantial justification. First, the defendants suggest that the government's position had no reasonable basis in the law. Similarly, the defendants next argue that the government's position was not reasonably based on the facts. And third, Pecore and Waniger argue that the government failed to adequately investigate the defendants' evidence. Each set of facts standing alone, the defendants assert, is enough to show that the government's position was not substantially justified. Like the district court before us, we'll evaluate each of these allegations individually.

1. *The Government's Position Was Reasonably Based On The Law*[4]

The defendants first contend that two legal errors prevented the government from ever establishing a substantially justified claim. First, the BIA failed to follow its own internal policies before the government filed suit. Second, the government's FCA suit was really a poorly disguised breach of contract suit. The government's failure to select the proper cause of action precluded it from developing a substantially justified FCA claim. Both arguments are baseless.

First, the defendants argue that the government violated the internal BIA policy manual and the Midwest Regional Office Handbook, both of which require the government to consult with Tribe personnel before taking federal action. Had the government obeyed the two internal consultation policies, the Tribe could have explained away the confusion about its fire reduction work, the rationale for its complex billing practice, and

---

[4] On appeal, the defendants argue for the first time that sovereign immunity protects tribal employees such as Pecore and Waniger from FCA suits, and as such, the government's position lacked substantial legal justification. Although the defendants made a similar sovereign immunity argument in their merits brief supporting summary judgment, which the district court rejected, the defendants did not raise this issue in their post-trial brief for EAJA attorney's fees. Accordingly, the defendants waived this argument as to EAJA attorney's fees, and we will not consider it. *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010).

whether the width of its fuel breaks complied with HFR standards. According to the defendants, had these conversations occurred, both parties could have avoided trial. But, as a threshold matter, a government agency's internal policies and procedures (as opposed to duly enacted regulations) do not have the force of law. *See Krasilych v. Holder*, 583 F.3d 962, 966 (7th Cir. 2009) (noting, for example, that the "Attorney General's guidelines are internal rules that have no legal force"). In this case, the clue as to the status of the BIA policy is located on the very first page of the Government-to-Government Consultation Policy, where it plainly states that the policy "illustrates the *guidelines* that the Bureau of Indian Affairs will follow for consultation with tribal governments." Bureau of Indian Affairs, Government-to-Government Consultation Policy 1 (2000) (emphasis added). Certainly agency guidelines do not carry the weight of law, and thus, any alleged violation can serve only as probative evidence that the government failed to file suit in good faith.

The seven cases cited by the defendants in support of their policies and procedures argument do not bolster their claim. Instead, each case only suggests the possibility for EAJA attorney's fees when the government violates a law, an agency regulation, or clear judicial precedent. *See, e.g., Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (awarding EAJA attorney's fees "because the ALJ contravened longstanding agency regulations, as well as judicial precedent"); *Golembiewski*, 382 F.3d at 724 (awarding EAJA attorney's fees because "the ALJ and Commissioner violated clear and long judicial precedent

and violated the Commissioner's own Ruling and Regulations"); *Or. Natural Res. Council v. Madigan*, 980 F.2d 1330, 1332 (9th Cir. 1992) (awarding attorney's fees after the agency failed to issue regulations demanded by clear statutory language). Because the defendants allege only that the government violated internal policy guidelines, we reject their first legal argument.

Even if the BIA's policies had the force and effect of law, the record belies the defendants' claim that they were not adequately consulted before the government brought suit. For example, Congos testified that he spoke with Waniger in 2001 about the work deficiencies Congos identified during his initial forest inspection, and Waniger promised to rework the identified areas. During the remainder of 2001 and 2002, Congos, Waniger, and Pecore communicated through written memoranda and work-completion maps about the status of the Tribe's HFR work. In 2005, the government contacted the Tribe to formally discuss the results of the OIG investigation. And, during much of 2006, the parties engaged in significant settlement negotiations. Each discussion occurred before the government brought suit in 2007. As a simple question of fact, the record reveals that the defendants had several years to eliminate any misunderstandings about its work. Ultimately, the defendants' internal-policies argument is baseless.

The defendants' second legal objection to the district court's ruling is that the court failed to recognize that the government's suit was more akin to a breach-of-contract action than an FCA action. According to the defen-

dants, if the government misused the FCA statute, then surely it could not have been substantially justified in bringing such a suit. As a result, the defendants claim the breach-of-contract action should have been governed by the Indian Self-Determination Education and Assistance Act ("ISDEAA").

We need not spend much time discussing the merits of the defendants' claim because the district court rightfully concluded that a case involving contract performance does not necessarily foreclose FCA liability. *Menominee Tribal Enters.*, 2010 WL 2465505, at *6 (*citing United States ex rel. Davis v. Dyna Corp.*, 17 F.3d 397 (9th Cir. 1994) (unpublished table decision)). It is perfectly logical for a contracting party to knowingly submit a false invoice purportedly pursuant to a valid contract. As we will discuss shortly, the government had reasonable grounds for believing that the defendants knowingly submitted false invoices, and as such, the government's claim fit neatly into the FCA.

Because the defendants' legal objections are without merit, we find that the government had substantial legal justification for bringing an FCA claim.

2.  *The Government's Position Was Reasonably Based On The Facts*

The defendants next contend that the government's position was not substantially justified because the government failed to prove its factual allegations at trial. Here, the defendants argue that an FCA claim requires the government to prove the defendants submitted a

false statement, *see Hindo v. Univ. of Health Scis./The Chicago Med. Sch.*, 65 F.3d 608, 613 (7th Cir. 1995), but the government could never prove that the defendants lied. In the absence of a lie, the government's position had no substantial factual justification.

Before reviewing the record, it is first important to recall that the substantial justification standard does not require the government to have won at trial. In fact, the government's position need not even be correct. *Pierce*, 487 U.S. at 566 n.2 ("[A] position can be justified even though it is not correct, and we believe it can be substantially (*i.e.*, for the most part) justified if a reasonable person could think it correct."). Rather, substantial justification only requires the position to have "a reasonable basis in law and fact." *Conrad*, 434 F.3d at 990; *Pierce*, 487 U.S. at 565 (a position need only be "justified to a degree that could satisfy a reasonable person"). Here, the defendants broad assertions that "[t]he government's [motive] theory collapsed at trial" and "the Government failed to prove that either Pecore or Waniger lied," only suggest that the jury sided with the defendants, not that their opponent's position was never substantially justified. Therefore, we generally ignore what the jury believed or did not believe at trial, and instead focus on whether the government's position as a whole could satisfy a reasonable person. *See Jean*, 496 U.S. at 161-62.

Moving to the facts, the defendants first argue with some force that the government could never articulate a reasonable motive theory. After all, why would two men

risk criminal and civil sanctions when they never received any benefits in return? Without a motive theory, the defendants contend that the government could not prove a lie or false claim, and without a lie, an FCA claim necessarily fails.[5] *Hindo*, 65 F.3d at 613. Although the defendants attempt to construe the motive question as uncontested, this issue was subject to conflicting evidence and testimony such that a reasonable person could have accepted either version of events, which is all we require. *Pierce*, 487 U.S. at 565. For example, the government maintained throughout trial that Congos and Pecore were looking for a source of funds to keep the Menominee Roads Department in the black. The district court heard testimony to this effect. On the other hand, the defendants claim that the government's "key" motive witness unknowingly contradicted the government's theory by suggesting that additional Roads Department funds were only spent three years after they were requested. The defendants construed this testimony as proof that the Roads Department never had an urgent need for additional funding, and thus, Pecore and Waniger were never motivated to falsify government invoices to obtain additional funding.

In pointing to the version of events that the jury apparently believed, the defendants ignore the legitimate

---

[5] Motive is not an element for an FCA claim. *See Hindo*, 65 F.3d at 613. Rather, the defendants appear to only highlight the lack of motive as evidence that defendants did not knowingly submit a false statement.

factual dispute that existed throughout the litigation. Instead, the defendants seem to simply rely on their trial victory. But this is not enough. Furthermore, even if we completely accept as true the defendants' version of motive, it still does not directly contradict or disprove the government's position that the Roads Department faced serious budget difficulties. Accordingly, the district court did not abuse its discretion in finding that the government's motive theory was substantially justified, even though it apparently failed at trial.

The defendants' second factual dispute highlights the miscommunication between the parties about Tribal billing practices. Here, the defendants claim that they never billed the government on a per-mile basis, but rather, only submitted bills for actual fire prevention costs incurred. Moreover, the bills detailing actual costs represented an accurate snapshot of MTE's legitimate costs. The defendants also contend that the maps submitted to Congos were never supposed to accurately represent the precise amount of work MTE had completed. Instead, the maps were only to be used as a general guide to their work. Accordingly, the defendants argue that government confusion was the reason for the charges against Pecore and Waniger, and thus, the government could never prove that Pecore or Waniger submitted a false claim.

As was the case for the factual dispute about the defendants' motive, the government offered evidence to counter the defendants' theory. First, the government offered testimony suggesting that MTE had submitted a

handful of invoices on a per-mile basis. Only after Congos's initial inspection did the Tribe change to cost-based invoicing. Next, the government offered a 2001 accomplishments memorandum prepared by Waniger stating that fuel breaks were created for 96.2 miles and that work was at least 95% completed. The government also offered testimony indicating that Waniger sub-mitted a second completion map to Congos after MTE rework was completed. Finally, the government offered Congos's testimony about his 2001 and 2002 inspections as well as his brief 2009 reinspection following the Ken Sloan report. On appeal, our review of the record confirms the district court's finding that there was ample confusion associated with the Tribe's invoices. We also agree with the district court's finding that "even if the Defendants' expense-based view of its billing was entirely correct, that did not entitle it to list areas of work done (by mileage) if those areas were not actually done." *Menominee Tribal Enters.*, 2010 WL 2465505, at *3. Ultimately, the intense nature of this debate suggests to us that either party's position could be ac-cepted as true by a reasonable person.

Two final points about the defendants' factual dis-putes bear mentioning. First, the defendants ignore the objective, although not necessarily conclusive, evidence that the government's complaint survived both a motion to dismiss and a motion for summary judgment. *United States v. Thouvenot, Wade & Moerschen, Inc.*, 596 F.3d 378, 382 (7th Cir. 2010) ("[T]here is a [rebuttable] presumption that a government case strong enough to survive both a motion to dismiss and a motion for summary judg-

ment is substantially justified.").[6] This objective evidence combined with the intensity of the factual disputes between the parties illustrates that the government had a substantial fact-based justification for bringing suit. The second, and perhaps more important, concluding thought is that our review is limited to a discussion of whether the district court abused its discretion. *Conrad*, 434 F.3d at 990. Although our own review of the record shows that the government's position was substantially justified, we must again acknowledge the district court's unique position to

---

[6] The defendants criticize *Thouvenot* because it supposedly shifts the government's statutory burden of proof to the prevailing defendant by creating a presumption of substantial justification if a case survives both a motion to dismiss and summary judgment. This is wrong. *Thouvenot* only construes a motion to dismiss or summary judgment victory as objective and perhaps compelling evidence of substantial justification. *Pierce*, 487 U.S. at 568 (finding that objective factors are relevant). Notably, *Thouvenot* left the door open for an attorney's fees award in those cases where something emerges at trial proving that the government never had a case or in those cases where the district court judge has new evidence to show that she "erred grievously in refusing to grant the defendant's motion to dismiss or motion for summary judgment." *Thouvenot*, 596 F.3d at 382. But, even if *Thouvenot* was somehow improperly decided, the district court in this case expressly stated that *Thouvenot* was only a second, independent ground for rejecting the defendants' EAJA motion. In other words, even if *Thouvenot* did not exist, the government's position was still substantially justified.

observe and weigh the evidence over two-and-one-half years of an intensely factual litigation. *Pierce*, 487 U.S. at 560 ("[S]ome of the elements that bear upon whether the Government's position '*was* substantially justified' may be known only to the district court."). Ultimately, the defendants have not offered anything to cast doubt on the district court's well-reasoned sixteen-page opinion.

For the preceding reasons, we find the district court did not abuse its discretion in concluding that the government's position had a substantial factual justification.

### 3.  *The Government Properly Investigated The Defendants' Evidence*

Finally, the defendants argue that the government failed to properly investigate its own FCA claim, in violation of 31 U.S.C. § 3730(a) ("The Attorney General diligently shall investigate a violation under section 3729."). Such a failure to investigate, according to the defendants, is further evidence that the government's position was never substantially justified. Pecore and Waniger assert that the government's reliance on stale Congos inspections instead of the more recent Sloan report exculpating the defendants is proof that the government failed to investigate. We disagree.

As a threshold matter and as the district court noted, the loose grasp the government supposedly had on the facts might have more to do with the defendants' border-line discovery abuses rather than the government's

failure to investigate to the defendants' liking. *See Menominee Tribal Enters.*, 2010 WL 2465505, at *4. We lend little credence to the defendants' argument that the government should have dropped its suit after reading the Sloan report when that report was not produced until the eve of trial. Second, there is no support for the defendants' apparent position that the government must give greater deference to the defendants' expert rather than rely on its own forester's inspections. Instead, trial litigation routinely boils down to a battle of experts, and a dispute between experts "tends to show a good faith dispute," *Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 464 F.3d 651, 656 (7th Cir. 2006), which is another way to say that both parties' claims were substantially justified. Third, the defendants' contention that Congos's inspections were stale as compared to the Sloan report is, at best, irrelevant. To the contrary, a reasonable person could have found that the Congos inspections were more reliable because they occurred closer in time to when the fire reduction work was supposedly completed. Finally, Congos testified at trial that the government conducted its own reinspection in October 2009 following the belated Sloan inspection. According to Congos, the Sloan photos showed some evidence of cutting unrelated to the HFR program, but other portions of the forest continued to show no signs of any fire prevention work. Ultimately, the defendants' contention that its inspection is better than the others is similar to the other fact-intensive disputes the defendants have highlighted on appeal. Like this other conflicting evi-

dence, the parties' debate about the validity of the inspections says little about substantial justification. Rather, the intensity of the dispute, both at trial and on appeal, shows that a reasonable person could have been satisfied by either party's theory. *Pierce*, 487 U.S. at 565.

Defendants' reliance on *Phil Smidt & Son, Inc. v. NLRB*, 810 F.2d 638 (7th Cir. 1987), is misplaced. There, we reversed the district court's refusal to impose EAJA attorney's fees against the government in part because of the strong contradictory evidence presented by the defendant. We chided the government for not making "*any* attempt to independently corroborate [its] allegation." *Id.* at 643 (emphasis added). In this case, however, the record reveals that the government investigated the Sloan report, reinspected portions of the forest, and concluded that Congos's inspections were more reliable. This is not a case where the government completely abdicated its duty to diligently investigate its claims against Pecore and Waniger.

Because the government's position throughout trial was substantially justified, the district court did not abuse its discretion in denying defendants' EAJA motion.

*B. Rule 37(c)(2) Sanctions*

The defendants allege that the district court also abused its discretion in denying its Rule 37 motion. Federal Rule of Civil Procedure 37(c)(2) provides that a district court must impose reasonable expenses including attorney's fees on a party that fails to properly admit the genuine-

ness of a document pursuant to a Rule 36 request for admission. Fed. R. Civ. P. 37(c)(2); *Hicklin Engineering, L.C. v. Bartell*, 439 F.3d 346, 351 (7th Cir. 2006). But, this rule provides an escape hatch for those parties that "had a reasonable ground to believe that it might prevail on the matter." Fed. R. Civ. P. 37(c)(2)(C). The district court found that the government fit into this exception, and thus, it denied the defendants' request for sanctions. We agree.

In its motion for sanctions and again on appeal, the defendants identify two types of Rule 36 requests that the government should have admitted. The first type was a request like Request 21, which asked the government to admit that the defendants incurred $8,707.50 in expenses related to invoice 200. The government denied knowledge sufficient to admit or deny the request. The second type of Rule 36 request asked the government to admit that work related to invoice 200, for example, had been substantially completed. The government unambiguously denied this type of request as it was the government's position all along that Pecore and Waniger submitted invoices for work that was incomplete, deficient, or both. The defendants served identical requests for several different invoices.

We need not spend much time disposing of the defendants' argument because we have already covered much of this ground in our EAJA analysis. There, we held that there was reasonable confusion surrounding MTE's invoices, completion maps, and accomplishment memoranda such that either party's position was "justified to a

degree that could satisfy a reasonable person*." Pierce*, 487 U.S. at 565. Rule 37(c)(2) incorporates a standard that is strikingly similar to *Pierce*. The 1970 Advisory Committee notes provide that "the true test under Rule 37(c) is not whether a party prevailed at trial but whether he acted reasonably in believing that he might prevail." Fed. R. Civ. P. 37 advisory committee's note; *see Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1326 (11th Cir. 2004). Based on our EAJA analysis, we find that the government reasonably believed it might prevail on the invoice and map issue for the same reasons we found the government's position to be substantially justified. Therefore, we find that the district court did not abuse its discretion in rejecting the defendants' request for Rule 37 sanctions.

## III. CONCLUSION

We hold that the district court did not abuse its discretion and accordingly, we AFFIRM its decision denying defendants' motions for attorney's fees under either EAJA or Rule 37(c)(2).